IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GRANT DUNSMORE, )
)
Plaintiff, )
)
vs. ) Civil Action No. 08-1277
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM OPINION

## I.   INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Grant Dunsmore and Defendant Michael J.
Astrue, Commissioner of Social Security. Plaintiff seeks review of
a final decision by the Commissioner denying his claim for
disability insurance benefits ("DIB") under Title II of the Social
Security Act, 42 U.S.C. §§ 401 *et seq.*[1] For the reasons discussed
below, Defendant's motion is denied and Plaintiff's motion is
granted insofar as he seeks remand for reconsideration.

---

[1]   The Administrative Law Judge indicated in his opinion that
Plaintiff had filed an application for supplemental security income
("SSI") benefits concurrently with his application for a period of
disability and disability insurance benefits. (Tr. 15 and 22.)
Plaintiff also refers to such an application in the brief in support
of his motion for summary judgment. However, there is no evidence in
the record regarding such an application for SSI benefits. We have
referred, therefore, only to Plaintiff's application for disability
insurance benefits.

## II. BACKGROUND

### A. Factual Background

After graduating from high school, Grant Dunsmore attended a state university for three years where he studied marketing and business, then received an associate's degree in computer science in 1985. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 6, "Tr.," at 431.) In October 1986, Plaintiff began working as an assistant terminal manager for a commercial trucking company, a position he maintained until February 1989. (Tr. 69, 64.) In May 1989, he moved into the position of transportation manager for a different trucking company. (Tr. 64, 432.) Mr. Dunsmore described the latter job as largely sedentary and involving supervision of about 150 employees, sales activity, and working on a computer. (Tr. 48-49.)

According to Mr. Dunsmore, beginning in the mid-1990s, he experienced a number of medical problems. In 1994, a portion of his large intestine was removed due to acute diverticulitis. Also in 1994, he experienced a mild heart attack and underwent angioplasty. In 1996, he had kidney stones removed and a stent placed in his right kidney. Following an automobile accident the same year, he underwent another surgery to repair his ruptured stomach. Carotid artery surgery was performed in 2000; the first attempt at cleaning out the artery was unsuccessful and it was

2

repeated a week or two later. The incision site became infected and a third surgery was performed, resulting in Mr. Dunsmore missing almost six months of work. In May 2002, he underwent percutaneous transluminal angioplasty[2] and stenting of his right coronary artery. (Tr. 451-453; 373.)

On February 4, 2003, Mr. Dunsmore underwent a cardiac catheterization to place two more stents in his heart. (Tr. 68, 453.) A few days later, on February 11, Plaintiff was checking some vehicles in his employer's parking lot. He stepped on a patch of ice and fell, landing on the back of his right shoulder and neck. (Tr. 433.) He did not return to work after his accident. Within a few months, Plaintiff began experiencing chronic pain in his neck and right shoulder.

## B. Procedural Background

Plaintiff applied for a period of disability and disability insurance benefits on July 29, 2004, claiming he was unable to work as of February 11, 2003, due to heart problems, a ruptured disc in his neck, diabetes mellitus, high blood pressure,

---

[2] Mr. Dunsmore testified this procedure took place in 2001, but the medical evidence shows it was done in May 2002. Percutaneous transluminal angioplasty is a procedure in which a partly occluded blood vessel (as one with atherosclerotic plaques on the walls) is expanded by passing a balloon catheter through the skin, into the vessel, and through the vessel to the site of the occlusion where the tip of the catheter is inflated. A short narrow tube, i.e., a stent, is then inserted to keep the previously blocked passageway open. See medical encyclopedia at the National Institute of Medicine's on-line website, www.nlm.nih.gov/medlineplus (last visited April 17, 2009), "Medline Plus."

coronary artery disease, loss of lower bowel, diverticulitis, gastric reflux, a peptic ulcer and a "bad neck." (Tr. 63.) His application was denied at the state agency level on December 1, 2004, the examiner having concluded Plaintiff could return to his past work as a transportation manager. (Tr. 29-30; 34-38.) Mr. Dunsmore sought a hearing before an Administrative Law Judge ("ALJ") which was held by the Honorable James Bukes on September 13, 2006. On December 12, 2006, Judge Bukes issued his decision, again denying benefits inasmuch as he found Plaintiff could perform a limited range of light work despite his impairments. (Tr. 15-22.) The Social Security Appeals Council declined to review the ALJ's decision on August 14, 2008, finding no reason pursuant to its rules to do so. (Tr. 5-8.) Therefore, the December 12, 2006 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000).

Mr. Dunsmore filed a second application for a period of disability and disability benefits, together with an application for supplemental security income, on January 11, 2007. (*See* Appendix, Plaintiff's Brief in Support of Motion for Summary Judgment, Doc. No. 10-2, at 12.) In an opinion dated November 3, 2008, a different ALJ concluded Plaintiff was no longer able to perform even a limited range of sedentary work and he was granted

4

benefits effective December 13, 2006, the first day following the Social Security Administration's adoption of Judge Bukes's opinion. (Id. at 6-11.)

Plaintiff filed suit in this Court on September 12, 2008, seeking judicial review only of Judge Bukes's decision denying benefits for the period February 11, 2003, through December 12, 2006.

C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence,

that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for a period of disability and to receive disability insurance benefits, the burden is on the claimant to show that he has a medically

6

determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[3] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). A claimant seeking DIB must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Dunsmore satisfied the first two non-medical requirements, and the parties agree that Plaintiff's date last insured will be June 30, 2009.

To determine a claimant's rights to DIB,[4] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

---

[3] According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[4] The same test is used to determine disability for purposes of receiving either DIB or supplemental security income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

7

(3)    if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)    if the claimant retains sufficient residual functional capacity ("RFC")[5] to perform his past relevant work, he is not disabled; and

(5)    if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 404.1520(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[6] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Bukes concluded at step one that Mr. Dunsmore had not engaged in substantial gainful activity at any time between February 11, 2003, his alleged disability onset date, through the date of his decision. (Tr. 17,

---

[5]  Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[6]  Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

8

22.) Resolving step two in Plaintiff's favor, the ALJ concluded Mr. Dunsmore suffered from diabetes mellitus, degenerative disc disease of the cervical and lumbar spine, and coronary artery disease, all of which were "severe"[7] as that term is defined by the Social Security Administration. (Tr. 17.) Although Plaintiff had also received treatment for hypertension, bowel problems, reflux disease, ulcers, and carpal tunnel syndrome with a left trigger finger, the ALJ concluded these conditions were not severe inasmuch as they imposed no more than minimal functional restrictions. (Tr. 18.) Similarly, the ALJ found Plaintiff's complaints of depression and anxiety were controlled with medication and ongoing treatment and did not result in limitations of his daily activities, social functioning, or concentration; therefore, Judge Bukes concluded

---

[7] *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n.5.

The ALJ's conclusion that Plaintiff's diabetes mellitus is severe is unsupported by the record. In fact, Plaintiff testified that he took no medication for that condition and his treatment consisted of periodic blood tests rather than continuous monitoring at home, statements which are consistent with the medical record. (Tr. 442; 81.) Similarly, there is no medical evidence the Court can identify which supports the conclusion that Plaintiff suffered from any degenerative disc disease of the lumbar spine, much less that it was severe. However, Plaintiff does not question these conclusions and the Court will not discuss them further.

9

these conditions were also "not severe."[8]  (Id.)   At step three, the ALJ concluded Plaintiff's diabetes mellitus had not resulted in end organ damage and therefore did not meet the criteria in Listing 9.08.[9]   Similarly, his degenerative disc disease, which the ALJ evaluated under Listing 1.04, had not resulted in an inability to ambulate effectively.[10]   Finally, the ALJ found that Plaintiff's

---

[8]   It is unclear how the ALJ arrived at this conclusion.  As far as this Court has been able to ascertain, there is only one reference to depression in the record.  That is, Plaintiff testified at the hearing that one of the medications he was taking caused "some slight depression."   (Tr. 445-446.)  We were unable to find any references to anxiety in the record; no psychological evaluation was done; Mr. Dunsmore did not claim disability due to depression or anxiety; and he did not refer to it in his activities of daily living questionnaire. More importantly, contrary to the ALJ's statement, there is no record of Plaintiff having receive any psychological medications or treatment.

Although the ALJ mentioned Plaintiff's fractured right patella, a partial removal of part of his colon as a result of diverticulitis, emplacement of a stent in May 2002, heart catheterization in 2003, cervical surgery in 2000, peripheral vascular disease, and kidney stones, he made no finding as to the severity of these conditions. Again, however, Plaintiff does not object to this omission and we do not address this issue.

[9]   The ALJ applied an incorrect criterion in this portion of his analysis.  Listing 9.08 is satisfied by showing (A) "neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station;" (B) "acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests . . . or (C) retinitis proliferans. (See Listing 9.08.)  Later in his decision, the ALJ writes, "There is no evidence of neuropathy, acidosis, or retinitis proliferans resulting in sustained disturbance of gross and dexterous movements" (Tr. 20), an obvious mis-statement of the criteria.  Plaintiff does not raise any arguments regarding this conclusion and therefore, we do not find this to be reversible error, standing alone.  On remand, the ALJ should consider the medical record against the proper elements of this Listing if he again finds Plaintiff's diabetes to be severe.

[10]   The ALJ apparently evaluated Plaintiff's degenerative disc disease only under Listing 1.04C, without considering Listing 1.04A or 1.04B.  Plaintiff does not argue that he did, in fact, satisfy one of

10

coronary artery disease did not satisfy any Listing.[11] He concluded

at step four that Mr. Dunsmore retained

> the residual functional capacity to lift/carry twenty
> pounds occasionally and ten pounds frequently, stand and
> walk for six hours in an 8-hour workday, and sit for six
> hours in an 8-hour workday from an exertional standpoint.
> Nonexertionally, he can occasionally tolerate postural
> activities but must avoid tasks requiring overhead work
> with the right hand and pushing/pulling with the right
> hand. His pain is not so significant as to interfere
> with sustained physical and mental activities.

(Tr. 19.)

According to the ALJ, at the hearing, Joseph Kuhar, a

vocational expert ("VE"), had testified that Plaintiff's previous

work as a transportation manager was a skilled, light exertion-

level job.[12] (Tr. 21, *see also* Tr. 455.) However, the ALJ

concluded Plaintiff could not return to his past relevant work due

the other relevant Listings, and we will not address this issue
further.

[11] The ALJ's opinion reflects an omission and/or clerical error
at this point since he does not refer to any Listing in his discussion
of Plaintiff's coronary artery disease, but instead refers to Social
Security regulations which, under certain circumstances, preclude an
award of benefits when there is evidence of drug and/or alcohol abuse.
There is no such evidence in this case. On remand, the ALJ should re-
evaluate Plaintiff's coronary artery disease according to the criteria
of Listing 4.04C.

[12] The vocational expert actually testified that Plaintiff's last
job as a transportation manager in the commercial trucking industry
between June 1989 and February 2003 was classified as skilled and
sedentary. (Tr. 455.) His previous job (1986-1989) as an assistant
terminal manager was classified as skilled and light. (Tr. 455-456.)
Thus, the ALJ confused the requirements of transportation manager,
Plaintiff's last job, with those of his previous job. The ALJ also
erred in noting that Mr. Kuhar had described the specific vocational
preparation level of the job of transportation manager was 5; he
actually testified that the level was 6. (Tr. 455.)

11

to exertional and non-exertional impairments. Mr. Kuhar further
testified, in response to the ALJ's hypothetical questions, that
Plaintiff's acquired knowledge of the trucking industry and his
typing skills would transfer to sedentary work as an expeditor.[13]
(Tr. 22, *see also* Tr. 457-458.)  He further testified that there
were other light occupations[14] in the national economy such as
unarmed security guard, courier or mold cleaner in the plastics
industry which a person of Mr. Dunsmore's age, education, work
experience, transferable skills, and RFC could perform. (Tr. 19,
*see also* Tr. 463.)  Accordingly, considering the Plaintiff's age,[15]
education, and transferable work skills, the ALJ determined at step
five that a finding of "not disabled" was appropriate under the
framework of Medical-Vocational Rule 202.15.  (Tr. 22.)

B.    Plaintiff's Arguments

In the brief in support of his motion for summary
judgment, Mr. Dunsmore raises two arguments.  First, Plaintiff
argues that the ALJ erred in determining that his allegations

---

[13]    In his opinion, the ALJ referred to the job of expeditor as a
semi-skilled position. (Tr. 22.)  According to the Dictionary of
Occupational Titles, the job requires specific vocational preparation
of over 1 year up to and including 2 years, level 6, indicative of
skilled work.  *See* job descriptions at Dictionary of Occupational
Titles, revised 4th edition, provided by the U.S. Department of Labor
at www.occupationalinfo.org (last visited April 17, 2009.)

[14]    Mr. Kuhar did not testify as to the skill level of these jobs.

[15]    Plaintiff was almost 51 years old on his disability onset date
and 54 and 1/2 at the time of the hearing, making him a person
"closely approaching advanced age."  20 C.F.R. § 404.1563.

12

regarding the intensity, persistence and limiting effects of his symptoms were not entirely credible. (Plaintiff's Brief in Support of Motion for Summary Judgment, Doc. No. 10, "Plf.'s Brief," at 10-15.) Second, the ALJ erred by relying on the testimony of the vocational expert in response to hypothetical questions which did not include all the limitations established by the medical record. (Id. at 15-16.)

1. *The ALJ's credibility analysis:* Plaintiff argues that in his credibility analysis, the ALJ selectively cited those portions of the record which supported a conclusion that his activities of daily living showed he could perform a wide range of light work despite his impairments. (Plf.'s Brief at 10-11.) The credibility finding "falls woefully short of the substantial evidence required by law" in that the facts on which the ALJ based his finding were either mis-stated or taken out of context. Second, the ALJ failed to consider the criteria set forth in Social Security Ruling 96-7p which are to be applied when a claimant alleges subjective symptoms such as severe pain. Mr. Dunsmore suggests that if the ALJ had considered those factors, he would have been compelled to find that Plaintiff's activities are very limited and he has extensive pain which is exacerbated with activity. (Id. at 12-13.) Third, the ALJ's analysis conflicts with case law of the United States Court of Appeals for the Third Circuit which requires that there be medical evidence to disprove

13

a claimant's testimony as to pain. (Id. at 13, *citing* Mason v. Shalala, 994 F.2d 1058, 1067-1068 (3d Cir. 1993).) It is equally well-settled in this Circuit that subjective evidence of disabling pain may support a claim, even if the pain cannot be objectively verified. Here, the ALJ did not cite to medical evidence which disproves Plaintiff's testimony and there is no evidence which implies that Plaintiff was malingering or being untruthful. (Plf.'s Brief at 14.) Finally, the ALJ failed to acknowledge that testimony regarding the ability to work which is provided by a claimant with a long work record is entitled to substantial credibility. (Id. at 15.)

We begin our analysis by summarizing the relevant Social Security Ruling ("SSR"),[16] 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements," which sets out the framework by which an ALJ is to consider subjective symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness. The initial presumption in considering subjective symptoms is that standing alone, no symptom or combination of symptoms, no matter how genuine they appear to

---

[16] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1); Williams v. Barnhart, No. 05-5491, 2006 U.S. App. LEXIS 30785, * 8 (3d Cir. Dec. 13, 2006). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

14

be, can be the basis for a finding of disability. But where such subjective evidence exists, the ALJ must undertake a two step analysis. First, the ALJ must determine if the subjective claims are supported by objective medical evidence, that is, whether there are "medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms." SSR 96-7p. Where such medical evidence exists, the second step of the analysis is for the ALJ to evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they affect his or her ability to do basic work activities.

However, subjective symptoms may suggest a greater severity of impairment than can be shown by objective medical evidence alone. In such instances, the ALJ "must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence." Id. In his credibility analysis, the ALJ is to consider the entire case record, i.e., "the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or

15

psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. Id. At the same time, a claimant's statements regarding subjective symptoms may not be disregarded solely because they are not substantiated by objective medical evidence.

In determining the credibility of an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work, the regulations identify seven factors to be considered by the ALJ:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; see also 20 C.F.R. § 404.1529(c)(3).

An ALJ may not simply rest his analysis on a conclusory statement, e.g., "the allegations are (or are not) credible;" rather, his decision "must contain specific reasons for the finding

16

on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id.

In most cases, a district court will give great deference to the ALJ's credibility determination because he or she is best equipped to judge the claimant's demeanor and attitude. *See* Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). However, the Court must review the factual findings underlying the ALJ's credibility determination to ensure that it is "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) (internal quotation omitted.) The reviewing court will reject an ALJ's credibility determination only if it is "patently wrong." Schmidt v. Barnhart, 395 F.3d 737, 746-747 (7th Cir. 2005).

Here, we find the ALJ's credibility determination not so much "patently wrong" as incomplete and based on a selective reading of the evidence. First, the ALJ addressed only the question of the effect of pain on Plaintiff's ability to perform basic work activities. Although Mr. Dunsmore testified to substantial fatigue and other side effects of medications, the ALJ gave those symptoms little or no consideration. Second, the analysis regarding Plaintiff's chronic pain does not take into consideration any of the seven factors other than his activities of daily living, and we

17

find that portion of his analysis to be based on a selective reading of the medical evidence.

As an example of a major omission by the ALJ, we note that his decision contains only a single reference to the side effects Plaintiff experienced from his numerous medications. An undated list prepared by Mr. Dunsmore includes nine medications taken at least daily and two more as needed. (Tr. 47.) The medications had reported side effects of fatigue, stomachache, headache, and "loss of vigor." (Tr. 67-68.) At the hearing, the ALJ asked Plaintiff about his medications, in particular, Norvasc,[17] which Plaintiff testified caused "some slight depression," fatigue, and loss of concentration. (Tr. 446.) The ALJ apparently questioned this testimony, relying on his own "pill book" which did not list fatigue as a side effect, but did include muscle weakness and sexual difficulties;[18] he also suggested that Plaintiff's doctors could prescribe a different medication. (Tr. 446-447.) In his decision, the ALJ referred to these side effects only in passing. *See* Tr. 19, "He said he cannot work because of his medication

---

[17] Norvasc (amlodipine) is a calcium channel blocker used alone or in combination with other medications to treat high blood pressure and angina. See drugs and supplements information at Medline Plus.

[18] The Court notes that the database maintained by the National Institutes of Health lists the following side effects of Norvasc: swelling of the hands, feet, ankles, or lower legs, *headache, upset stomach, stomach pain*, dizziness or lightheadedness, drowsiness, *excessive tiredness*, and flushing. *See* drugs and supplements information at Medline Plus (emphasis added for those side effects alleged by Plaintiff.)

18

causing depression, fatigue, and loss of concentration." There is no determination of Plaintiff's credibility regarding these side effects nor of the reported side effects from other medications Plaintiff requires such as metroprolol and plavix[19]. (Tr. 67-68.)

With regard to the persistence, intensity and limiting effects of pain on Plaintiff's ability to perform work-like activities, the ALJ's analysis is equally incomplete. We recognize that an ALJ is not required to refer to every item in the medical record. Fargnoli v. Halter, 247 F.3d 34, 42 (3d Cir. 2001). However, the medical evidence here, taken as a whole, shows that after his injury on February 11, 2003, Plaintiff began having chronic pain in his cervical spine and right shoulder which he had not previously experienced. After more than three years of conservative treatments with a general practitioner, Dr. Larry E. Baling, an orthopedic surgeon, Dr. Robert W. Piston, and consultation with another orthopedic surgeon, Dr. James D. Kang, he eventually underwent arthroscopic surgery on his right shoulder with subacromial decompression, rotator cuff debridement and distal clavicle excision, performed by Dr. David A. Tonnies on April 18, 2006. The evidence shows, as the ALJ reported, that Mr. Dunsmore's

---

[19]  Metoprolol is a beta blocker used alone or in combination with other medications to treat high blood pressure, to prevent angina, and to treat heart attacks. Plavix (clopidogrel) is used to prevent strokes and heart attacks in patients at risk for these problems. Clopidogrel is in a class of medications called antiplatelet drugs which help prevent harmful blood clots. See drugs and supplements information at Medline Plus.

pain in his shoulder, arms and hands decreased following the surgery. However, the latest medical evidence prior to the hearing on September 14, 2006, reflects that he was doing "fairly well," but still experienced pain with certain motions, which Dr. Tonnies attributed in part to residual inflammation and tendinitis and in part to his cervical spinal problems. This is the only pain to which the ALJ refers in his opinion, yet the evidence shows, for instance, chronic epicondylitis[20] in both arms. While ALJ acknowledged this condition (Tr. 17), he never determined its severity or the effect it might have on Plaintiff's ability to lift and carry. Nor did he address Plaintiff's long-standing pain in his legs while walking for a distance as short as several hundred yards.[21] (Tr. 83.) There is no mention of the fact that Plaintiff began using a TENS unit[22] in 2003 or that he underwent numerous physical therapy courses in conjunction with his shoulder, neck and

---

[20] Lateral epicondylitis (commonly referred to as "tennis elbow") is the inflammation, soreness, or pain on the outside (lateral) side of the upper arm near the elbow. There may be a partial tear of the tendon fibers, which connect muscle to bone, at or near their point of origin on the outside of the elbow. Symptoms include elbow pain that gradually worsens, pain radiating from the outside of the elbow to the forearm and back of the hand when grasping or twisting, and weak grasp. The diagnosis is made by clinical signs and symptoms, since x-rays are usually normal. *See* medical encyclopedia at Medline Plus.

[21] This condition is discussed in more detail below in the section on the hypothetical questions posed to the vocational expert.

[22] A "TENS unit," or transcutaneous electrical nerve stimulator, is a device which sends electrical impulses to designated parts of the body in order to block pain signals. *See* entry at en.wikipedia.org (last visited April 17, 2009.)

back pain.

We conclude that the ALJ's failure to provide any substantive discussion of Plaintiff's fatigue, side effects of medication, and chronic pain other than that associated with his neck and shoulder leaves this Court unable to complete the "meaningful judicial review" required. *See* Burnett v. Commissioner of SSA, 220 F.3d 112 (3d Cir. 2000) (where an ALJ's decision fails to address significant medical evidence or explain his reasoning, the decision is "beyond meaningful judicial review" by the district court on appeal.) We are therefore compelled to remand for reconsideration of this evidence.

As for Plaintiff's last argument regarding the ALJ's credibility determination, we agree that the ALJ apparently did not take into consideration his long and stable work history. As noted above, Mr. Dunsmore was steadily employed, with only one three-month gap, from October 1986 to February 2003. During that time, he underwent 12 surgeries, suffered a heart attack, and developed several chronic medical conditions, yet continued to work in responsible management positions.

In a parallel case, the Court of Appeals for the Third Circuit found a claimant's testimony that he was unable to return to work was entitled to "substantial credibility," assuming those limitations were also supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979). In

Dobrowolsky, the plaintiff had worked as a meat cutter, despite repeated hospitalizations for ischemia and coronary insufficiency. He was also diagnosed with degenerative disc disease, lumbosacral strain, cervical strain, sciatic neuritis, and hypertension. Id., 606 F.2d at 403-404. After his release from the hospital following an automobile accident, Dobrowolsky attempted to work for another year, but could do so only sporadically because of his medical conditions. At his hearing, Dobrowolsky testified that recurrent pain prevented him from performing even light work. The Court of Appeals concluded:

> testimony of subjective pain and inability to perform even light work is entitled to great weight, particularly when, as here, it is supported by competent medical evidence. Moreover, when the claimant has a work record like Dobrowolsky's twenty-nine years of continuous work, fifteen with the same employer, his testimony as to his capabilities is entitled to substantial credibility.

Dobrowolsky, 606 F.2d at 410.

We recognize that a claimant's work history is but one of many factors an ALJ must consider in assessing a claimant's subjective complaints and that a long work history does not necessarily equate with credibility. 20 C.F.R. § 404.1529(c)(3) ("We will consider all of the evidence presented, including information about your prior work record. . . ."); Telesha v. Barnhart, CA No. 01-2371, 2003 U.S. Dist. LEXIS 16359, *28, n.6 (M.D. Pa. Mar. 31, 2003); Brubaker v. Barnhart, CA No. 05-76, 2005 U.S. Dist. LEXIS 36790, *12 (E.D. Pa. Dec. 29, 2005). Here, however, the ALJ gave no

indication that he acknowledged Mr. Dunsmore's work history, in particular the fact that, like Dobrowolsky, he returned to work despite multiple medical problems affecting his health over a period of years. In such a case, remand for re-evaluation of his credibility in light of this work history is necessary. *See* Gates v. Astrue, CA No. 07-202, 2008 U.S. Dist. LEXIS 64139, *20-*21 (W.D. Pa. Apr. 14, 2008) and cases cited therein.

2. *The hypothetical questions posed to the vocational expert:* Mr. Dunsmore's second argument is that the ALJ erred in relying on the VE's response to hypothetical questions which did not include all Plaintiff's limitations of record. In particular, none of the questions include his limitations with regard to his ability to sit, stand, walk and lift. Plaintiff contends that standing causes great pain and cramping which require him to sit or lie down. His medications affect his concentration and cause headaches; he needs to avoid temperature extremes. These limitations are supported not only by Plaintiff's testimony but by the medical evidence of record. Since even the most restrictive question posed by the ALJ did not include all these limitations, his reliance on the VE's testimony that alternative work exists in the local and national economies which Mr. Dunsmore could perform is unjustified. Remand is necessary for further consideration at step five of the ALJ's analysis. (Plf.'s Brief at 15-16.)

Under well-established Third Circuit law, hypothetical

questions posed to a vocational expert must "fairly set forth every credible limitation established by the physical evidence." Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. Pa. 1999), *citing* Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) ("A hypothetical must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence.")  This includes limitations which are not severe.  Burnett, 220 F.3d at 122 ("the ALJ must consider the combined effect of multiple impairments, regardless of their severity.")  At the same time, the ALJ is not required to incorporate every limitation alleged by a claimant. Where the claimant asserts limitations which lack objective medical support, the ALJ may reject such limitations based on conflicting evidence in the record, "but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it."  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).

At the hearing the ALJ asked the following hypothetical questions to the vocational expert:

Q:   I want to pose several hypotheticals also considering claimant's age, educational and work experience. Let's assume a capacity for light work and [the ability to] occasionally engage in all postural limitations . . . Let's assume this person is right handed and should avoid overhead work with the right hand and also should avoid push/pulling.

* * * * *

24

Q:    Let's also assume that this person could stand and walk three
      to five hours in an eight-hour day, sit unlimited.  Would that
      allow performance of any past work?

A:    . . . Yes, it would, Your Honor.  It would allow . . . him to
      engage in any of his . . . past work that we have testified to
      today. . . .

Q:    If this person would need to avoid any jobs that require rapid
      movements with the fingers or fine manipulation, would that
      affect your testimony?

A:    Yes, it would because . . . he was required to be involved
      with extensive computer usage.  It would certainly eliminate
      the work that he was involved with in both of his previous
      occupations, Your Honor.

(Tr. 456-457.)

     The vocational expert then explained that other light work –

unarmed security guard, courier, and mold cleaner for the plastics

industry – could still be performed despite these limitations.

Moreover, someone with Mr. Dunsmore's experience would have

transferable skills applicable to other sedentary work, namely,

typing and an extensive knowledge of the trucking industry, which

would allow him to work as an expediter in the manufacturing area,

a job which required a limited amount of typing but a great deal of

telephone work.  (Tr. 457-458.)  However, upon further questioning,

the vocational expert agreed that if the person could not do any

typing at all, that job would be eliminated as well.   (Tr. 458.)

     In his discussion of Mr. Dunsmore's RFC, the ALJ wrote,

"Nonexertionally, he can occasionally tolerate postural activities

but must avoid tasks requiring overhead work with the right hand

and pushing/pulling with the right hand." (Tr. 19.)   He later

25

stated that, "The claimant is unable to perform his light past relevant work due to his exertional and nonexertional impairments." (Tr. 21.)

We begin with the ALJ's conclusion that Plaintiff could work at the light exertional level, which is defined by the Social Security Administration as work which

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

Social Security Ruling 83-10 also provides that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."

In December 2003, Plaintiff reported to Dr. Baling that he had

> some discomfort in the right calf whenever he is walking. He can walk for several hundred yards and then he notes that the right calf pain begins. The problem usually makes him stop and then after 5-10 minutes he can walk another several hundred yards before he has the difficulties once again. He notes that his feet have been cold, bilaterally, but no other complaints.

(Tr. 83.) Plaintiff noted this pain in his activities of daily living questionnaire prepared in September 2004 (Tr. 58) and he testified at the hearing that when he walks "any distance," he gets cramping in his left leg which his cardiovascular surgeon, James

26

Gebhart, attributed to narrowing of the arteries in both legs.[23]
(Tr. 448.)

Concerning Plaintiff's ability to sit for long periods of time, on July 20, 2004, Dr. Baling wrote with regard to Plaintiff's disk protrusions and bulging disks:

> [t]he unfortunate part of this is his symptoms are such that he has difficulty working. He cannot sit for long hours in a chair in one position which he often must do in his type of work and he is certainly incapable of any amount of physical labor with his cervical spine difficulties that would undoubtedly rupture a disk and worsen his condition considerably. However, at least medically speaking he can do some walking on level ground in tempered weather conditions as long as he's not carrying anything.

(Tr. 81.)

Dr. J. H. Kim, a one-time consulting physician who examined Plaintiff on October 22, 2004, found that he could stand and walk for a total of three to five hours a day and could sit eight hours providing he had the option to sit and stand at will. (Tr. 256.) A non-examining state-agency physician, Dr. Alfred Mancini, who reviewed the reports from Drs. Baling and Kim on November 24, 2004, gave them little weight, finding them to be inconsistent with the medical evidence of record, but he did not identify the medical evidence to which he referred. (Tr. 264.) He also concluded Plaintiff could stand or walk for six hours in an eight hour day and could sit for the same length of time without need for a

---

[23] The Court has been unable to identify any evidence in Dr. Gebhart's notes to support this statement. (*See* Tr. 416-421.)

sit/stand option.  (Tr. 259.)  Plaintiff testified at the hearing
that he can sit for no more than two hours before getting tired,
becoming irritable and losing concentration, then he must stand and
walk around for 15 or 20 minutes.  (Tr. 449.)

The ALJ fails to mention Dr. Baling's evaluation, the only
evidence by a treating physician which states his opinion of
Plaintiff's ability to sit, perform "any amount of physical labor,"
or walk.  There is no evidence that between July 2004 and September
2006 Plaintiff's ability to sit, stand and walk improved to the
level described by the ALJ in his hypothetical questions, i.e.,
stand and walk for three to five hours a day and sit for a full
eight hours, without a sit/stand option.  Yet, the hypothetical
questions posed to the vocational expert all were based on the
assumption that Mr. Dunsmore could perform light work and sit for
unlimited periods of time.  As Plaintiff argues, contrary to well-
established Third Circuit law, the ALJ did not identify the medical
evidence in the record which contradicts his testimony or Dr.
Baling's opinion regarding Plaintiff's ability to sit, stand and
walk for the periods of time the ALJ concluded were applicable.
"In the absence of such an indication, the reviewing court cannot
tell if significant probative evidence was not credited or simply
ignored."  Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

Plaintiff also testified that he occasionally has to lie down
"anywhere from an hour to two hours" in an eight-hour day.  (Tr.

28

449.) At the hearing, the ALJ asked the vocational expert:

Q: And let's assume that this person would also have a side
   effect from medication[24] such that he would need to lie down
   for let's say a half hour [on] random occasions three times a
   day. Would that change your testimony?

A: Yes, it would your Honor and the reason it would is that
   typically breaks occur during each four hours of work, and
   these breaks have to be scheduled in varying times between ..
   . five and 20 minute [periods] with the most common being 15
   minutes . . . . Therefore, there would be no work existing in
   significant numbers in either the local, regional or national
   economy that such a person could perform in my opinion without
   more than reasonable accommodation being provided for those
   random periods of rest as you have indicated in your most
   recent hypothetical, Your Honor.

(Tr. 459.)

    In his written decision, the ALJ concluded that work existed

for a person with Plaintiff's other characteristics.  We must

assume, therefore, that he rejected Plaintiff's testimony regarding

his need to rest periodically during the day.  However, there is no

analysis in his decision which states his finding in that regard,[25]

nor does he explain why he rejected the VE's testimony on this

point.  There is no direct medical evidence to either support or

refute Plaintiff's testimony on this issue, but had the ALJ

_____

    [24]  The ALJ assumed this fatigue was a side effect of Plaintiff's
medication.  (Tr. 459.)  However, there is evidence in the record that
fatigue is also a side effect of exertion.  See, for instance,
Plaintiff's questionnaire regarding activities of daily living where
he indicated he has to rest after 5 to 15 minutes of activity (Tr. 58)
and his testimony that "after a couple of swipes" while mowing the
lawn with a self-propelled mower, he would be out of breath and have
to rest.  (Tr. 450-451.)

    [25]  In his opinion, the ALJ indicated Plaintiff testified that "he
naps about two hours each day." (Tr. 19.)  This statement is not an
accurate report of Plaintiff's testimony as quoted in the text above.

accepted the VE's response to this question, Plaintiff would have been found disabled at step five and awarded benefits. Remand is necessary in order for the ALJ to provide an explanation of his reasoning on this issue.

**V.    FURTHER PROCEEDINGS**

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

Here, we are not convinced that the evidence as a whole leads to the inevitable conclusion that Plaintiff is entitled to benefits for the entire period of February 2003 through September 2006. However, we find the failure of the ALJ to clearly explain his residual functional analysis and why he rejected Plaintiff's testimony and reports regarding the extent and intensity of his chronic pain to be significant omissions which require remand for clarification. Similarly, the omission of any explanation why the ALJ rejected the vocational expert's testimony regarding the inability of a claimant to perform any type of work if he were

compelled to take multiple unscheduled rest breaks during the course of the work day makes his reliance on the VE's testimony questionable. We therefore find that this case should be remanded for further consideration consistent with the analysis herein.

An appropriate order follows.

April __23__, 2009

_William L. Standish_
William L. Standish
United States District Judge